UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SALMAN ABDIRHAMAN MOHAMED,<br><br>Petitioner,<br>v.<br><br>BRUCE SCOTT et al.,<br><br>Respondents. | CASE NO. 2:26-cv-03353-DGE<br><br>ORDER ON PETITION FOR WRIT OF HABEAS CORPUS (DKT. NO. 1) |

Presently before the Court is Petitioner Salman Abdirhaman Mohamed's petition for writ of habeas corpus. (Dkt. No. 1.) Petitioner contends Respondents violated his procedural due process rights by re-detaining him at a routine check-in without prior written notice, a meaningful opportunity to respond, or a hearing before a neutral decisionmaker. (*Id.* at 8.) Respondents argue Petitioner is subject to mandatory detention under 8 U.S.C. § 1225(b) based on the termination of his parole, which previously was granted pursuant to 8 U.S.C. § 1182(d)(5). (Dkt. No. 4 at 5–6.) Having considered the petition, Respondents' return and

supporting declarations (Dkt. Nos. 4, 5, 6), and Petitioner's traverse (Dkt. No. 7), the Court GRANTS the petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Petitioner is a native and citizen of Somalia. (Dkt. No. 1 at 5.) He entered the United States on or about November 28, 2022 at a time and place other than as designated by the Attorney General and was subsequently detained by a United States Border Patrol agent.[1] (*Id.*; Dkt. No. 6 at 2.) The following day Petitioner was paroled into the United States pursuant to 8 U.S.C. § 1182(d)(5) due to detention capacity limitations and was released with a Form I-94 on Alternative to Detention program as a condition of parole.[2] (Dkt. Nos. 1 at 5; 6 at 2.) His parole was authorized until December 14, 2022.[3] (Dkt. No. 5-4 at 2.)

---

[1] There appears to be inconsistencies in the record about when Petitioner entered the United States and when he was arrested by border patrol. In the Form I-213, it states that Petitioner entered the United States at an unknown date and location and that he was arrested by United States Border Patrol on November 11, 2022. (*See* Dkt. No. 5-2 at 4.) Both the Form I-94 and the Parole Termination Notice state Petitioner entered the United States on November 27, 2022. (*See* Dkt. Nos. 5-5 at 2; 5-4 at 2.) The Respondents' return memorandum provides that Petitioner entered the United States on November 28, 2022. (*See* Dkt. No. 4 at 3.) The Declaration of Deportation Officer Kurtis Reed, which the Respondents cite to in their return memorandum, makes no mention of when Petitioner entered the United States but states he was arrested on November 28, 2022. (*See* Dkt. No. 6 at 2.) The Petitioner states he entered on or about November 28, 2022. (*See* Dkt. No. 1 at 5.)

[2] The I-94 is unclear as to the purpose for which parole was granted; the purpose could be read as "212(a)(B)," "212(a)(13)," "212(9)(B)," or "212(9)(13)." (*See* Dkt. No. 5-4 at 2.) And assuming 212 is a reference to INA § 212, such section is codified at 8 U.S.C. § 1182. Petitioner identifies INA § 212(d)(5)(A), codified at 8 U.S.C. § 1182(d)(5)(A), is typically the basis for parole. (Dkt. No. 7 at 4.)

[3] On the Form I-213, it appears to state that "on January 14, 2023, United States Border Patrol ("USBP") paroled [Petitioner] into the United States." (Dkt. No. 5-2 at 3.) This appears to contradict the Form I-94 which indicates Petitioner was paroled into the United States on November 29, 2022 until December 14, 2022. (Dkt. 5-4 at 2.) This Court follows what was provided in the Form I-94 as the correct dates.

On March 9, 2023, Petitioner filed a Form I-589, Application for Asylum and Withholding of Removal with the United States Citizenship and Immigration Services ("USCIS").[4] (Dkt. Nos. 1 at 6; 6 at 2.) His application remains pending. (Dkt. No. 1 at 2.)

On August 31, 2026, Petitioner appeared for a routine Immigration and Customs Enforcement ("ICE") check-in at the Seattle Enforcement and Removal Operations ("ERO") Field Office. (Dkt. Nos. 1 at 6; 6 at 2.) At the check-in, ERO "made a custody redetermination and issued a Warrant of Arrest of Alien," thereby taking Petitioner into custody. (Dkt. No. 5-2 at 3.) On the same day, Petitioner was served a Notice to Appear ("NTA") charging him as inadmissible under the Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i).[5] (Dkt. No. 5-1 at 2.) Petitioner was also served a Parole Termination Notice informing him ICE determined the purpose for which his parole was authorized has been accomplished or that neither humanitarian reasons nor significant public benefit warrant his continued parole. (Dkt. No. 5-5 at 2.) The termination notice does not reflect a specific change in circumstances. (*Id.*; 6 at 2.) He was also provided a Notice of Rights and Request for Disposition and a Notice of Custody Determination. (Dkt. No. 5-2 at 4.) The Notice of Custody Determination states that the Petitioner was detained pursuant to § 236 of the INA. (Dkt. No. 5-1 at 5.) Petitioner was transferred to the Northwest ICE Processing Center ("NWIPC") the same day. (Dkt. No. 6 at 3.)

On September 17, 2026, Petitioner filed a Bond Redetermination Request. (*Id.*) On September 21, 2026, Petitioner had an initial master calendar hearing but requested a continuance to find legal representation. (*Id.*) It appears on the same day ERO "mistakenly filed

---

[4] The deportation officer's declaration provides that the Petitioner filed a Form 1-589 Application for Asylum on March 24, 2023. (Dkt. No. 6 at 2.) However, we use the date provided by the Petitioner.

[5] INA § 212(a)(6)(A)(i) is codified at 8 U.S.C. § 1182(a)(6)(A)(i).

a Form I-830 with the Tacoma Immigration Court stating that Petitioner had been transferred to McFarland, California" despite the Petitioner not actually being transferred out of the NWIPC. (*Id.*) As a result, ERO issued an updated Form I-830 confirming that Petitioner remains detained at the NWIPC to support changing venue back to the Tacoma Immigration Court. (*Id.*) Respondents claim that once the case is moved back to the Tacoma Immigration Court, Petitioner will be scheduled for a new bond hearing. (*Id.*)

### B. Procedural Background

Petitioner filed a petition for writ of habeas corpus on September 15, 2026, arguing that Respondents violated his procedural due process rights under the Fifth Amendment by re-detaining him without written notice or a meaningful opportunity to be heard. (Dkt. No. 1.) Pursuant to the Court's scheduling order (*see* Dkt. No. 2), Respondents filed a return on September 30, 2026 (Dkt. No. 4). Respondents argue that Petitioner is subject to mandatory detention pursuant to 8 U.S.C. § 1225(b). (*Id.* at 5.) Respondents also assert that since Petitioner was paroled into the United States, he was never considered admitted into the country, and once they terminated his parole, his status returned to that of an applicant for admission. (*Id.* at 5–6.) Thus, they argue a noncitizen seeking initial entry into the United States has no entitlement to any legal rights other than those provided by statute. (*Id.* at 8.) Petitioner filed a traverse on October 2, 2026 (Dkt. No. 7).

## II. LEGAL STANDARD

A writ of habeas corpus is "available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art. I, § 9, cl. 2). To succeed on his habeas petition, Petitioner "must show [he] is in custody in violation of the Constitution or laws or treaties of the United States." *Doe v. Bostock*, No. C24-0326-JLR-SKV,

2024 WL 3291033, at *5 (W.D. Wash. Mar. 29, 2024), *report and recommendation adopted*, No. C24-0326JLR-SKV, 2024 WL 2861675 (W.D. Wash. June 6, 2024) (citing 28 U.S.C. § 2241). Because habeas proceedings are civil in nature, the "[p]etitioner 'bears the burden of proving that he is being held contrary to law, . . . [and] he must satisfy his burden of proof by a preponderance of the evidence.'" *Aditya W. H. v. Trump*, 782 F. Supp. 3d 691, 703 (D. Minn. 2025) (quoting *Freeman v. Pullen*, 658 F. Supp. 3d 53, 58 (D. Conn. 2023) (citations omitted)).

## III. ANALYSIS

Petitioner argues that, by re-detaining him without affording him any written notice or meaningful opportunity to be heard prior to re-detention, Respondents deprived him of his liberty in violation of the Due Process Clause of the Fifth Amendment. (Dkt. No. 1 at 8.)

### A. Petitioner is Not Detained Under 8 U.S.C. § 1225(b)

Respondents state there is no dispute Petitioner is subject to mandatory detention under 8 U.S.C. § 1225(b) because he was detained near the border and released on parole pursuant to 8 U.S.C. § 1182(d)(5). (Dkt. No. 4 at 5.) Respondents argue that pursuant to 8 C.F.R. § 212.5(e)(2)(i), upon termination of Petitioner's parole, his status reverted to the status he had when he was initially apprehended, which is that of an applicant for admission. (Dkt. No. 4 at 5–6.) Respondents assert that "a noncitizen seeking initial entry to the United States 'has no entitlement' to *any* legal rights, constitutional or otherwise, other than those expressly provided by statute." (*Id.* at 8) (quoting *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107 (2020)).

The Secretary of Homeland Security may, in their discretion, parole a noncitizen seeking admission into the United States under such conditions as they may prescribe "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit[.]" 8 U.S.C.

§ 1182(d)(5)(A). "[S]uch parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled[.]" *Id*.

Parole may be terminated either automatically or with notice.[6] *See* 8 C.F.R. § 212.5(e). Parole is *automatically* terminated without written notice "upon the departure from the United States of the [noncitizen]" or "if not departed, at the expiration of the time for which parole was authorized. 8 C.F.R. § 212.5(e)(1)(i)-(ii). Distinct from automatic termination is termination upon written notice. 8 C.F.R. § 212.5(e)(2). Written notice occurs when (1) a charging document is served on the noncitizen or (2) when an authorized official notifies the noncitizen in writing that "the purpose for which parole was authorized" has been accomplished or that "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States." 8 C.F.R. § 212.5(e)(2)(i). Whether termination occurs automatically or through written notice, the noncitizen "shall be restored to the status that he or she had at the time of parole." 8 C.F.R. §§ 212.5(e)(1)(ii), 212(e)(2)(i). And, only if an "exclusion, deportation, or removal order cannot be executed within a reasonable time," the noncitizen "shall again be released on parole" unless it is determined by an official with authority pursuant to § 212.5(a) that continued custody is appropriate. 8 C.F.R. § 212.5(e)(2)(i). To summarize, once

[6] Respondents argue that no written notice was required to terminate parole since Petitioner's parole was automatically terminated upon its expiration date on December 14, 2022. (Dkt. No. 4 at 7–8.) Yet, Respondents still provided notice of termination of parole on August 31, 2026. (Dkt. No. 5-5 at 2.) However, as noted by the deportation officer, the parole termination notice reflects no specific change in circumstances. (Dkt. Nos. 6 at 3; 5-5 at 2.) Parole was originally granted due to detention capacity limitations, yet ICE fails to provide any information regarding current detention capacity. Instead, the Form I-213 indicates that the decision to re-detain Petitioner was due to the "lack of ongoing proceedings" with the Executive Office for Immigration Review and USCIS. (Dkt. No. 5-2 at 3.)

parole terminates, the regulations require re-detention, and a noncitizen may only be released on parole again if a removal order cannot be executed within a reasonable time.

Here, it cannot be disputed Petitioner was paroled into the United States and that such parole terminated automatically on December 14, 2022. (*See* Dkt. No. 5-4 at 2.) At that point in time, Petitioner reverted back to the status he maintained at the time he was detained on November 28, 2022 and should have been taken into custody. *See* 8 C.F.R. § 212.5(e)(2)(i). Instead, however, Respondents chose to disregard their own regulations and release Petitioner under supervision into the United States under some status *other than* parole. The reason for this conclusion is because Petitioner could have been released again on parole only if he was subject to an "exclusion, deportation, or removal order [that could not] be executed within a reasonable time." *Id.* On December 14, 2022, Petitioner was not subject to any removal order. Thus, Respondents had no authority under § 212.5(e)(2)(i) to release Petitioner on parole after December 14, 2022, which means Petitioner's release was governed by something other than the mandatory detention provision of 8 U.S.C. § 1225(b).

This conclusion is supported by Respondents' Notice of Custody Determination which was issued "[p]ursuant to the authority contained in section 236" of the INA, otherwise known as 8 U.S.C. § 1226. (Dkt. No. 5-1 at 5.) It also is supported by the NTA, which identifies Petitioner was not an arriving alien and that he had neither been admitted or paroled in the United States. (*Id*. at 2.) It further is supported by the deportation officer's declaration, which acknowledges that Petitioner is entitled to a "new bond hearing." (Dkt. No. 6 at 3.) And, lastly it is supported by the fact that Petitioner was allowed to be at liberty from December 15, 2022 to August 31, 2026 before being re-detained.

Because the Court finds Petitioner remained at liberty after December 14, 2022 on a status other than parole, the Court finds and concludes Petitioner is not subject to the mandatory detention provisions of § 1225(b).

**B. Petitioner's Re-Detention Violated Due Process**

The Due Process Clause protects against deprivation of liberty without proper process, and this protection extends to deportation proceedings. U.S. Const. amend. V. ("No person shall be . . . deprived of life, liberty, or property, without due process of law[.]"); *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) ("'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings.") (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). "The application of the Due Process Clause to a noncitizen generally turns on whether that individual is 'within the territory of the United States.'" *Padilla v. United States Immigr. & Customs Enf't*, No. 24-2801, 2026 WL 2822044, at *29 (9th Cir. Sept. 21, 2026) (quoting Wong Wing v. United States, 163 U.S. 228, 238 (1869)). Physical entry into the United States is the "pivotal factor on which the scope of a noncitizen's due process rights turns." *Id.* Although noncitizens who remain on the threshold of initial entry are generally limited to the procedural protections Congress has authorized, those who are apprehended well within the country's borders are entitled to the protections of the Fifth Amendment's Due Process Clause, regardless of whether their entry was lawful. *Id.* at 36.

The traditional test for evaluating due process claims set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), "can and must account for the heightened governmental interest in the immigration detention context." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong*

*v. Manzo*, 380 U.S. 545, 552 (1965)). *Mathews* employs a three-factor test looking at (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest." 424 U.S. at 335. The first *Mathews* factor considers "the private interest that will be affected by the official action." *Id.* Courts have continually recognized an immigration detainee's private interest in freedom from imprisonment. *See Hamdi*, 542 U.S. at 529 (finding freedom from detention "the most elemental" of private interests); *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."); *Doe v. Becerra*, 787 F. Supp. 3d 1083, 1093 (E.D. Cal. 2025).

1. <u>Private interest</u>

This Court has previously identified that an individual who was initially released from immigration custody is deprived of this private interest in freedom from imprisonment upon a renewed detention. *See Makuey v. Scott*, No. 2:25-cv-02135-DGE-BAT, 2025 WL 3640900, at *4 (W.D. Wash. Dec. 16, 2025) (finding the petitioner "has now been undeniably deprived of [his interest in liberty] because he was arrested, transferred to the NWIPC, and remains detained today" following an earlier release).

Here, Petitioner was initially arrested on November 28, 2022 and released on parole the following day. (Dkt. No. 6 at 2.) Despite the expiration of his parole on December 14, 2022 (Dkt. No. 5-4 at 2), Respondents authorized Petitioner to remain at liberty and such authorization created a liberty interest. "Once established, Petitioner's interest in liberty [became] a constitutional right which [could] only be revoked through methods that comport with due

process, such as a hearing in front of a neutral party to determine whether Petitioner's re-detainment [was] warranted." *Ramirez Tesara v. Wamsley*, 800 F. Supp. 3d 1130, 1136 (W.D. Wash. 2025) (citing *Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023)).

Petitioner's strong private interest in his continued liberty means the first *Mathews* factor weighs in his favor.

2. Risk of erroneous deprivation of interest through procedures used

The second *Mathews* factor examines "the risk of an erroneous deprivation of [the petitioner's private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards[.]" *Mathews*, 424 U.S. at 335. Here, the risk of erroneous deprivation *without any hearing* was/is high.

Respondents seek to justify Petitioner's re-detention based on their argument that he is subject to mandatory detention pursuant to § 1225. (Dkt. No. 4 at 7–8.) However, the record indicates ICE officials decided to detain Petitioner "[b]ased on [Petitioner's] lack of ongoing [removal] proceedings." (Dkt. No. 5-2 at 3.) These two conflicting reasons for detaining Petitioner indicate a high risk of erroneous deprivation. And importantly, Petitioner filed an application for asylum on March 9, 2023, which remains pending. (Dkt. Nos. 1 at 2, 6; 6 at 2.) Petitioner also regularly attended check-ins with Respondents. (Dkt. No. 1 at 2.) Thus, Respondents had knowledge of Petitioner's presence in the United States, authorized that presence, and then without notice extinguished his liberty on the supposed basis that he was not in removal proceedings. Under the circumstances presented, a reasonable neutral decisionmaker, arguably, would not have authorized Petitioner's re-detention.

In short, given the high risk of erroneous deprivation, the second *Mathews* factor weighs in Petitioner's favor.

3. Government's interest

The third *Mathews* factor contemplates "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

Admittedly, Respondents have an interest in ensuring a noncitizen appears at future immigration proceedings and that a noncitizen does not pose a danger to the community. *Zadvydas*, 533 U.S. at 690. However, there is no evidence Petitioner is a flight risk or a danger to the community. Petitioner identifies he complied with all prior reporting requirements. (Dkt. No. 1 at 2.) Respondents do not contest that Petitioner followed reporting requirements. Providing notice and an opportunity to be heard would not have been unduly burdensome when weighed against the governmental interests involved.

In sum, all three *Mathews* factors favor Petitioner. Petitioner has proven by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c).

## IV CONCLUSION

Accordingly, the Court GRANTS Petitioner's writ of habeas corpus (Dkt. No. 1) and ORDERS:

1. Respondents and all their officers, agents, attorneys, and persons acting on their behalf or in concert with them SHALL release Petitioner from custody within **ONE (1) day** of this Order. Petitioner shall be subject to the same conditions previously governing his release.

2. Petitioner SHALL NOT be re-detained, absent urgent circumstances or a clear legal basis for detention, without first providing pre-deprivation notice and an opportunity to be heard in front of an immigration judge.
3. Within **TWENTY-FOUR (24) hours** of this Order, Respondents SHALL provide the Court with a declaration confirming Petitioner has been released from custody.
4. Petitioner seeks an award of fees. (Dkt. No. 1 at 9.) Petitioner is GRANTED leave to file a motion for attorney fees. The motion for fees shall identify the legal authority supporting an award of fees and shall be filed **no later than January 7, 2027**.

The Clerk is directed to calendar this event and close the matter.

Dated this 9th day of October, 2026.

David G. Estudillo
United States District Judge